UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA C. HOLAUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07 CV 810 DJS |
| | ) | DDN |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Sandra C. Holaus for disability insurance
benefits and supplemental security income under Title II and Title XVI
of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and
1381, et seq. The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28 U.S.C.
§ 636(b). For the reasons set forth below, the undersigned recommends
that the ALJ's decision be affirmed.


**I.  BACKGROUND**

Plaintiff Sandra C. Holaus was born on April 30, 1963.  (Tr. 75.)
She is 5'8" tall with a weight around 150 pounds.  (Tr. 153.)  She is
divorced and has five children, ranging from 13 years old to 25 years
old.  (Tr. 205.)  She completed eight years of school and last worked at
Shop-N-Save in its deli department.  (Tr. 90, 97.)

On January 5, 2005, Holaus applied for disability insurance benefits
and supplemental security income, alleging she became disabled on March
7, 2002, on account of attention deficit hyperactivity disorder (ADHD).[1]

---

[1]Attention deficit hyperactivity disorder (ADHD) is characterized
by symptoms of inattention, hyperactivity, and impulsivity, which have
been present for at least six months, and which are disruptive and
inappropriate for the person's developmental level. Diagnostic and
Statistical Manual of Mental Disorders, 92-93 (4th ed., American

(Tr. 31, 51, 76.)  She received a notice of disapproved claims on March 17, 2005.  (Tr. 51-55.)  She received an unfavorable decision on August 15, 2006.  (Tr. 8-9.)  After a hearing on May 4, 2006, the ALJ denied benefits on August 15, 2006.  (Tr. 10-22, 30-33, 233-75.)  On March 23, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 3-5.)

## II.  MEDICAL HISTORY

On March 28, 2000, Holaus saw Peggy Goldfader, M.A., a licensed psychologist, for an evaluation of her ADHD.  Holaus noted taking Effexor for depression and attending therapy groups once a week.  Holaus reported that she worked four separate jobs, the longest of which lasted one year. She had never been fired, but had difficulty with getting to work on time, absenteeism, and talking too much.  Goldfader found Holaus appropriately dressed, cooperative, friendly, and pleasant throughout the testing.  Her affect was appropriate, and her mood appeared euthymic,[2] but she became frustrated easily.  Goldfader noted Holaus acted hyperactive, impulsive, and inattentive.  "She was markedly fidgety, including constantly swinging her leg under the table.  She spoke excessively and very quickly.  She was easily distracted, and directions needed to be repeated."  Goldfader found Holaus was impulsive and gave up easily. Holaus had a full scale IQ of 81, which was low average, and a working memory scale of 85, which was also low average, on the Wechsler Adult Intelligence Scale.[3]  She had attention problems, and on the Brown Attention Deficit Disorder Scale, ranked in the "ADD highly probable" range.  Her reading and math scores fell in the low average range, while

_____

Psychiatric Association 2000).

[2]"Euthymic" is defined as relating to euthymia.  "Euthymia" means joyfulness and mental peace and tranquility.  Stedman's Medical Dictionary (25th ed.) at 545.

[3]An IQ score between 71 and 84 is classified as borderline intellectual functioning.  Hutsell v. Massanari, 259 F.3d 707, 708 n.3 (8th Cir. 2001) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39-40, 684).  An IQ score of about 70 or below is classified as mental retardation.  Id.

her written language skills fell in the extremely low range. Goldfader assigned Holaus a GAF score of 55, and concluded that Holaus appeared to have "clinically significant attention problems."[4] Goldfader recommended treatment for her attention difficulties and further vocational counseling. (Tr. 218-24.)

On September 12, 2000, Holaus saw Dr. Saaid Khojasteh, M.D., a psychiatric doctor. He noted Holaus was groomed, with regular speech, but had an anxious mood. She denied any suicidal or homicidal ideation and there was no evidence of organic problems. Her memory was fair. Dr. Khojasteh diagnosed Holaus with ADHD. (Tr. 215.)

Sometime in 2001, Holaus lost her medical coverage, becoming unable to afford all of her medication. She continued to buy Adderall, which cost her $98.00 a month. (Tr. 87.)

On August 11, 2004, the medical notes indicate Holaus had been out of medication for the past year because of financial problems. (Tr. 210.)

On January 5, 2005, M. Curiel completed a face-to-face interview with Holaus. Curiel found Holaus had trouble reading, concentrating, and talking. During their interview, Holaus "was all over the place, she was super hyper. I could barely follow her train of thought . . . ." Curiel added that she had limited reading and writing ability, and because of how hyper she was, definitely needed to be on her medication. Curiel concluded that "I can see why she keeps getting fired and cannot hold on to a job." (Tr. 160-62.)

On February 6, 2005, Holaus completed a work history report. From October 2004 to December 2004, she worked in the deli department of a grocery store. She worked between four and eight hours a day, three to five days a week. As part of the job, she walked, stood, and handled big

---

[4]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 55 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

-3-

and small objects between four to eight hours every day.  She lifted up to fifty pounds, and frequently lifted twenty-five pounds.  From March to July 2003, she worked at the cash register at another grocery store.  The physical requirements were similar to those of her job in the deli department.  From October 2002 to January 2003, she worked as a banquet server in a hotel restaurant.  As part of the job, she walked and stood for eight hours a day, and would lift up to twenty pounds.  From August 2001 to July 2002, and from April 2001 to June 2001, she worked in the deli department of a grocery store, with requirements similar to those of her most recent deli job.  From September to December 2003, and from April to November 1998, she worked as a housekeeper.  Holaus also worked other odd jobs from time to time.  (Tr. 90, 138-45.)

On February 7, 2005, Holaus completed a function report.  She noted taking care of her 13-year old child and taking care of her dog.  She had no problems caring for herself or preparing her own meals.  Holaus did her laundry, fixed things around the house, and did lawn work.  She could drive by herself.  Holaus stated that her impairments affected her ability to stand, sit, talk, concentrate, complete tasks, understand things, follow instructions, get along with others, and remember things.  She could walk without needing to rest, but could not sit for too long because she would lose focus.  Holaus had trouble following instructions, and would have to read each step over again to understand them.  Her impairments did not affect her hobbies or interests.  Holaus said she would stress over small things.  (Tr. 103-10.)

On February 7, 2005, Holly Williams, Holaus's daughter, completed a third-party function report.  She noted spending as little time as possible with Holaus, because her mother was too hyper and bounced around too much.  In a typical day, she said her mother would do chores and clean the house, but was easily distracted and would not complete anything she started.  Williams noted that Holaus was able to care for her daughter, her pets, and had no trouble with personal care or hygiene.  Holaus could cook for herself and do her chores, but needed to be reminded to complete tasks.  According to Williams, Holaus's impairments affected her ability to follow instructions, complete tasks, get along with others, concentrate, and remember things.  Her short-term memory was

poor, which made it hard for her to complete tasks.  Holaus could handle
difficult situations well, but simple problems created stress.  She did
not need to rest after walking.  (Tr. 110A-118.)

On February 14, 2005, Holaus was treated for hammer toe.[5]  She noted
severe pain in her foot and back, and difficulty walking.  (Tr. 203.)

On March 1, 2005, Holaus was treated for a severely contracted
second digit of the right foot.  She was given a crest pad and told to
return as needed.  (Tr. 164.)

On March 3, 2005, Holaus received a psychological evaluation from
L. Lynn Mades, Ph. D., a licensed psychologist at Forest Park Medical
Clinic, Inc.  Her chief complaint was ADHD.  She indicated that she was
hyper and talked quickly, which made her hard to understand.  She also
complained of problems with writing and spelling.  A direct mental status
examination showed Holaus was well-groomed, cooperative, and pleasant.
She was spontaneous, coherent, relevant, and logical.  Her motor activity
was significantly agitated and her speech was rapid, but there were no
tangents or flight of ideas.  Her mood was euthymic and no mood
disturbance was apparent.  She had no preoccupations, thought
disturbances, or perceptual distortions.  She reported no delusions and
she denied any suicidal or homicidal ideation.  Holaus's thought process
was logical and sequential.  Holaus noted she was able to do chores,
drive, and care for herself.  On the whole, Dr. Mades found Holaus was
extremely agitated and overactive, "with rapid and excessive speech that
seemed beyond what might be expected with ADHD but would be consistent
with amphetamine use."  Holaus stated that she had used amphetamines ten
years ago, but denied any present-day use.  The examiner assigned Holaus
a GAF score of 70-75.[6]  (Tr. 204-09.)

---

[5]Hammer toe is a deformity of the toe, in which the end of the toe
is bent downward, assuming a claw-like position.  Severe hammer toe
requires surgery to straighten the joint, but if the condition is treated
early, surgery can often be avoided.  National Institutes of Health,
http://www.nlm.nih.gov/medlineplus/ency/article/001235.htm (Last visited
July 15, 2008).

[6]On the GAF scale, a score of 75 represents transient symptoms, to
the extent any symptoms are present (such as difficulty concentrating
after a family argument) or no more than slight impairment in social,

On March 16, 2005, Judith A. McGee, Ph.D., a medical consultant, completed a mental residual functional capacity assessment of Holaus. McGee found Holaus was not significantly limited, or was only moderately limited, in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. In particular, McGee noted that Holaus retained the "ability to complete simple repetitive tasks." Holaus's social interaction was also intact, but McGee believed that more limited social contact might decrease her distractions. (Tr. 120-23.)

On March 16, 2005, McGee completed a psychiatric review technique. McGee noted that she was basing her decision on organic mental disorders and substance addiction disorders. After completing her review, McGee diagnosed Holaus with ADHD and amphetamine abuse. McGee found Holaus had no restriction of her daily living activities or any extended episodes of decompensation. Holaus had mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. McGee noted that Holaus had some problems getting along with others, but ultimately concluded that Holaus retained the ability to do simple work. (Tr. 124-36.)

On May 6, 2005, Holaus completed a disability report appeal. She noted seeing Dr. F. Mohs, who prescribed her ADHD medication. She also noted receiving treatment for her toe from Dr. Edward Stein. Holaus stated that she cannot work, cannot write, spell, or take orders. (Tr. 92-98.)

On January 19, 2006, Laura Martin-Anson, OTR/L, a vocational evaluator, assessed Holaus's functional physical abilities. As part of the assessment, Holaus indicated her vocational goals involved working in food preparation, mail sorting, and retail displays. Holaus felt she was physically able to perform these goals, and could lift up to fifty pounds. She demonstrated complete range of motion and good body mechanics. She was able to lift fifty pounds of assorted groceries with only moderate exertion. She had some difficulty descending stairs, while

---

occupational, or school functioning (such as temporarily falling behind in work). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

carrying objects, because of decreased depth perception.  Martin-Anson concluded that Holaus's vocational goals seemed "realistic considering her physical abilities."  (Tr. 184-94.)

On January 20, 2006, Martin-Anson completed an employment assessment summary for Holaus.  According to the assessment, Holaus demonstrated average to above average cognitive processing speed and productivity skills.  She was able to learn best from a visual demonstration and verbal instructions.  She exhibited good interviewing skills and good social skills.  She was accepting of supervision and got along well with others.  She demonstrated fair to good work skills, such as punctuality, attendance, and consistent follow-through on assignments.  On the other hand, Holaus showed difficulty with attention and concentration skills. Because of her trouble concentrating, Holaus stated that she would be best suited in a position in which she could remain constantly working. This work trait often caused her to be avoided by other co-workers, who viewed her as overly competitive.  Holaus had below-average short-term memory skills and below-average executive functioning and problem solving skills.  Holaus reported that she owned an antique store in the past and "feels that she continues to have the ability to own and operate a business."  Holaus added that "she would like to pursue employment at this time in order to gain a more stable work history."  Holaus reported that she planned to work part-time, and would consider working full-time if she was denied disability benefits.  At the time, she was taking Ampheta, a generic for Adderall, to treat her ADHD symptoms.  She was compliant with the medication.  (Tr. 172-84.)

On January 23, 2006, Holaus was evaluated by Vocational Services for Applied Scholastic, a company for which Holaus would wash dishes and cut vegetables.  The evaluation noted that Holaus's problem-solving, decision-making, planning, organization, efficiency, new learning, and sequencing were all fair.  New information needed to be repeated because of short-term memory problems.  She was not rated poor in any category. Her decision-making received the second-highest score, indicating she is able to make decisions, and can organize and prioritize work with minimal assistance.  Her emotional responsiveness received the highest score,

indicating she maintains her composure and attention to tasks without assistance. (Tr. 169-71.)

On January 29, 2006, Holaus completed another work history report. She noted doing odd jobs for various businesses from 1982 to 2002. As part of these jobs, she would have to walk, stand, reach, and handle objects for four hours each day, stoop for three hours each day, kneel for two hours each day, and crouch for one hour each day. She lifted up to fifty pounds and frequently lifted twenty-five pounds as part of these jobs. (Tr. 146-52.)

On January 29, 2006, Holaus completed a disability report. She noted that she became unable to work on March 7, 2002, because of ADHD. The ADHD limited her ability to concentrate and limited her writing and reading skills. Holaus saw Dr. Khojasteh for medication starting in January 2000. She also noted going to Neuropsychological Diagnostics for an assessment, and to Volunteers of Medicine for follow-ups. At the time of the report, she was taking Adderall for ADHD, Effexor for depression, and Neurontin for anxiety. (Tr. 153-59.)

On January 30, 2006, Holaus was evaluated by Vocational Services for a mail-sorting company. Her emotional responsiveness received the highest score, indicating she maintains her composure and attention to tasks without assistance. Her decision-making also received the highest score, indicating she makes up her own mind, and can effectively sequence steps in a procedure. (Tr. 166-68.)

From August 2004 to April 2006, Holaus was regularly prescribed Adderall. (Tr. 196.)

On April 25, 2006, Holaus was taking dextramphetmine sulfates as a substitute for Adderall. She reported taking two 10-milligram tablets, three times a day. The medication was first prescribed in February 2000, and was used to combat her attention deficit disorder, her compulsive disorder, and her anxiety. Dr. Khojasteh prescribed the medication. (Tr. 85.)

**Testimony at the Hearing**

At the hearing on May 4, 2006, Holaus began by describing her work history. In December 2005, she noted working with the Center for Head

Injuries, a vocational rehabilitation firm, to help her find a job. Holaus had last been employed from October to November 2004, when she worked in the deli department of Shop-N-Save. She was fired when she could not adequately remember the codes for the meats. She applied for unemployment benefits and did not seek employment after that. (Tr. 233-40.)

Holaus has five children, though none of them live with her. She does not have any income and was denied medicaid insurance. She said that her boyfriend supports her. Holaus said that physical problems also prevented her from working. Her toes curled on top of each other and problems with the pad of her foot made it difficult to walk, walk down stairs, and stand for any length of time. Her feet had been bothering her for the past two years. A doctor told her she needed surgery, but she could not afford it. She has painful varicose veins. Finally, her right knee shifted out of its socket. (Tr. 240-43.)

At the time of the hearing, Holaus was taking three tablets of Adderall, three times a day, for her ADHD. She was also taking Effexor for her depression. Dr. Prosky of Volunteers in Medicine provided the prescriptions. Holaus smoked about half a pack of cigarettes a day, but denied drinking or doing any illegal drugs. Other than her physical problems, Holaus believed her ADHD, panic attacks, compulsive disorder, and short-term memory loss prevented her from working. The ADHD caused short-term memory loss, and Holaus said her writing and reading abilities were at a third-grade level. (Tr. 243-46.)

Holaus also complained of having a compulsive disorder. She noted that her employers would tell her she was peculiar and that she made people nervous. Holaus had been off Effexor and started retaking it in August 2004. The Effexor dulled her mood, where she was neither happy, nor sad, "just there." In a typical day, Holaus would wake up at 11 a.m., and just clean the house or piddle around. She might work outside, cook, or spend time with her children. She also liked going to antique stores. She did not do any shopping for her family. Some days she would not even get out of bed, because she was very tired. (Tr. 246-51.)

Holaus received food stamps, but did not reapply when her boyfriend was able to afford her groceries. She was in special education classes

in school until she decided to stop going to school. Before working at Shop-N-Save, Holaus worked as a cashier for four months. She was fired from her cashier job because she could not remember the codes, her drawer was sometimes short, and because she could not remember certain procedures. The company suggested Holaus apply for another job in the store because she was a hard worker and did not talk to other employees. Holaus said the other employees found her strange, because of hyperactive nature. (Tr. 251-55.)

Before the cashier job, Holaus worked as a housekeeper at St. Joseph's Hospital. She was fired after ten months for absenteeism, because she had a problem getting to work on time. One of her supervisors also told her she made patients and nurses nervous. She also worked at the Holiday Inn as a banquet server in 2001. She was fired after a few months on the job because she could not remember how to do certain tasks. Holaus also had problems keeping still, and would get bored, become fidgety, and take too many bathroom breaks. In 1997, Holaus worked at Leer, putting together car seats. That job caused her problems with her hands. In 1998, she worked for four months at Zoltech, cutting carbon fibers. That job caused her severe hand problems, and she ended up going to the hospital. She also had problems remembering how to do certain aspects of her job at Zoltech. In 1988 and 1989, Holaus worked with her sister at a family-run antique store. She stopped working there because she was not going to work. Despite her difficulties keeping a job, Holaus said she enjoyed working. (Tr. 255-61, 266.)

Holaus testified that she was obsessive-compulsive. She would count things for no reason and constantly clean things. The Adderall helped. She noted being fidgety and falling asleep in movies because she could not sit still. She suffered from hammer toes, which made it hard to stand for longer than thirty minutes and hard to walk for long periods. A doctor suggested surgery for her foot, but she could not afford it. Holaus did not think she could sit for eight hours a day, even if she had three breaks. (Tr. 261-66.)

During the hearing, Jeffery Frances Magrowski, Ph.D., testified as a vocational expert (VE). Magrowski summarized Holaus's work history and

classified the jobs by skill levels. In the first hypothetical situation, the ALJ asked the VE to assume that Holaus was limited to performing simple repetitive tasks, with no more than occasional contact with the public and co-workers, and was able to perform within the light to medium exertional capacity. Based on these characteristics, the VE testified that Holaus could perform her past housekeeping work and a job she had doing stocking work. In the second hypothetical situation, the ALJ asked the VE to assume the characteristics in the first situation, and include an additional limitation of being able to stand and walk for no more than thirty minutes at a time. Under these circumstances, the VE testified that Holaus would not be able to perform any of her past work, but could perform other unskilled and sedentary jobs, such as a food and beverage order clerk, a surveillance system monitor, and some simple assembly work. This testimony was consistent with the <u>Dictionary of Occupational Titles</u>. (Tr. 266-70.)

If the VE assumed that Holaus had short-term memory loss and problems remembering things, she would not be able to work as a food and beverage order clerk. If the VE assumed Holaus read and wrote on a third-grade level, she could not work as a food and beverage clerk, but she could work an assembly job or the surveillance job. If the VE assumed Holaus had difficulty concentrating, she could not do the food clerk job, the assembly job, or the surveillance job. The same would be true if the VE assumed Holaus would need to take seven or eight bathroom breaks in an eight-hour work day, or if the VE assumed Holaus was compulsive. (Tr. 270-75.)

### III. DECISION OF THE ALJ

The ALJ began his decision by summarizing Holaus's medical history, noting her treatment by Peggy Goldfader, Dr. Saaid Khojasteh, Volunteers in Medicine Clinic, Dr. Edward Stein, and Dr. L. Lynn Mades. The ALJ also summarized Holaus's vocational evaluation by the Center for Head Injury Services and her testimony at the hearing. (Tr. 10-17.)

After looking to the entire record, the ALJ found Holaus suffered from ADHD, poor written communication skills, and hammer toes. The ALJ found these impairments were severe. The ALJ found Holaus did not have

severe impairments from her right knee pain and varicose veins.  The ALJ
also concluded that Holaus's complaints were not entirely credible.  In
his opinion, the medical findings did not support Holaus's allegations
concerning the intensity or persistence of the pain, or the effect of the
pain on her ability to work.  Holaus had not always taken her Adderall
medication, because of financial problems, and admitted to taking
amphetamines.  At other times, Holaus appeared to be abusing her
prescription, having gone through her medication too quickly.  Dr. Mades
noted Holaus had no problems with language abilities, her daily
activities were unremarkable, she got along well with others, and
exhibited adequate attention and concentration with appropriate
persistence and pace.  The ALJ noted that Holaus's performance during the
food service assessment was fair to good.  She performed the sorting mail
job well.  The ALJ concluded that there was no evidence Holaus would be
precluded from performing work-related activities because of ADHD.  (Tr.
15-18.)

The ALJ discounted Holaus's physical complaints as well.  Holaus
complained of problems with her right foot, problems with her knees,
hammer toes, and varicose veins.  Yet, she reported no physical problems
during a psychological evaluation in March 2005, and reported no foot
problems during the vocational evaluation completed between December 2005
and January 2006.  Her two on-site work assessments involved prolonged
standing.  Despite allegations of panic attacks, the ALJ found no
evidence that Holaus ever presented complaints of this condition to her
doctors.  The ALJ found no evidence of trauma or another physical cause
that would explain her short-term memory loss.  The ALJ noted Holaus had
very poor written expression, suffering from a low IQ and poor
communication skills, but concluded that this disorder would not preclude
all forms of work activity.  The ALJ found no evidence of any doctor
imposing functional limitations on Holaus, and found no evidence that
indicated her Adderall was ineffective or produced severe side effects.
(Tr. 18-19.)

Taken as a whole, the ALJ found no medical evidence indicating
Holaus was completely disabled.  There was no evidence of medical
treatment before August 2004, though she had seen two different

psychiatrists in 2000.  There were no medical records indicating Holaus had a severe impairment and could not work.  Indeed, none of her physicians ever recommended that she cease working.  At the same time, Holaus reported doing several activities, like cleaning, cooking, driving, shopping, and doing activities with her children.  In reaching his conclusion, the ALJ found the extensive vocational report provided the best assessment of Holaus's abilities.  (Tr. 19-21.)

Ultimately, the ALJ found Holaus could not perform any of her past relevant jobs.  However, the ALJ found Holaus could perform work in the light to medium exertional range in simple repetitive tasks.  The ALJ also found Holaus could tolerate no more than occasional contact with the general public and co-workers, and would need to alternate between sitting and standing positions every thirty minutes.  Relying on the testimony by the vocational expert, the ALJ found there was a significant number of jobs Holaus could perform.  Accordingly, the ALJ found Holaus was not disabled within the meaning of the Social Security Act.  (Tr. 21-22.)

## IV.   GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Here, the Commissioner determined that Holaus could not perform her past relevant work, but could perform a significant number of jobs in the state and national economy.

## V. DISCUSSION

Holaus argues the ALJ's decision is not supported by substantial evidence. In particular, she argues the ALJ erred by: 1) relying on the testimony of the vocational expert; 2) failing to properly consider the requirements for light and medium work; and 3) failing to properly consider her non-exertional limitations in computing her RFC.

**Vocational Expert**

The Commissioner can rely on the testimony of a VE to satisfy its burden of showing that the claimant can perform other work. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. Id. The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole. Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

In his testimony, the VE found that Holaus could not perform her past work, but could perform work as a food and beverage order clerk, a surveillance system monitor, and a lamp-shade assembler. Holaus argues that the requirements of these jobs are beyond her RFC and inconsistent

-14-

with the VE's testimony.  She argues the VE's testimony should not be given any weight.

The job of order clerk requires a reasoning level of 3, which includes the ability to apply commonsense understanding to carry out instructions in various forms, and the ability to deal with problems involving concrete variables from standard situations.  U.S. Dep't of Labor, <u>Dictionary of Occupational Titles</u> § 209.567-014 (4th ed. 1991), <u>available at</u> 1991 WL 671794.  The job also requires a language level of 2, which includes the ability to write compound and complex sentences, using proper end punctuation, and employing the use of adverbs and adjectives.  <u>Id.</u>  The Commissioner appears to concede that the job of food and beverage order clerk is beyond Holaus's qualifications.  (Doc. 13 at 12) ("The job of order clerk (food and beverage) has a language level of 2, which assumes an ability to write compound and complex sentences, using cursive style, proper end punctuation, employing adjectives and adverbs.  This may exceed Plaintiff's RFC.").

The surveillance job requires a reasoning level of 3 and a language level of 3.  <u>Dictionary of Occupational Titles</u> § 379.367-010, <u>available at</u> 1991 WL 673244.  A language level of 3 requires the ability to write "reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech."  <u>Id.</u>  Since the ALJ found Holaus suffered from poor written expression, the demands of the surveillance job would also seem to fall beyond Holaus's abilities.

The lamp-shade assembly job requires a reasoning level of 2, a language level of 1, and is classified as sedentary work.  <u>Dictionary of Occupational Titles</u> § 739.684-094, <u>available at</u> 1991 WL 680137.  A reasoning level of 2 requires the ability to apply commonsense understanding to carry out detailed, but uninvolved written and oral instructions.  <u>Id.</u>  It also requires the ability to deal with problems involving a few concrete variables from standard situations.  <u>Id.</u>  A language level of 1 requires the ability to print simple sentences containing subject, verb, and object, and the ability to speak simple sentences, using normal word order.  <u>Id.</u>  Sedentary work involves sitting most of the time, with brief walking and standing, and occasionally exerting up to ten pounds of force.  <u>Id.</u>

The ALJ found Holaus could perform light to medium exertional work involving simple repetitive tasks.  The requirements of the lamp-shade assembly job are consistent with Holaus's RFC.  While the VE's testimony may have been inconsistent with the DOT's requirements for a food and beverage order clerk and a surveillance monitor, the VE's testimony was entirely consistent with the DOT's requirements for a lamp-shade assembler.  Looking to the DOT, Holaus has the RFC to perform the lamp-shade assembly work, and the ALJ did not err by relying on this portion of the VE's testimony.  Substantial evidence therefore supports the ALJ's conclusion that Holaus has the ability to perform other work.

**Light and Medium Work**

Under the regulations, light and medium work involves "a good deal of walking or standing . . . ."  20 C.F.R. § 404.1567.  Holaus argues that the ALJ determined she is unable to stand for longer than thirty minutes, and therefore the ALJ failed to properly consider the requirements of light and medium work.

The job of lamp-shade assembler is classified as sedentary work - not light or medium work.  Dictionary of Occupational Titles § 739.684-094, available at 1991 WL 680137.  As noted above, sedentary work involves sitting most of the time, with only brief walking and standing required.  Accordingly, the ALJ was not required to consider the demands of light or medium exertional work to concluding Holaus could perform other work.

**Non-Exertional Limitations**

Holaus argues the ALJ failed to consider her non-exertional limitations.  In particular, Holaus argues the ALJ failed to consider her poor short-term memory, her poor written communication skills, her poor concentration, and her low IQ score.

A review of the ALJ's decision shows that he properly considered these alleged limitations.  In his decision, the ALJ noted that Holaus alleged difficulties with short-memory loss, but found no evidence of trauma or any other physical cause that would account for her short-term memory problems.  The ALJ also considered her allegations of poor

concentration, but noted that Dr. Mades had found Holaus exhibited adequate attention and concentration with appropriate persistence and pace. Finally, the ALJ expressly found that Holaus suffered from very poor written expression and a low IQ, but ultimately concluded that these conditions did not prevent her from working. A review of the ALJ's decision reveals he properly considered the claimant's alleged non-exertional limitations.

Holaus argues the Eighth Circuit has found an IQ of 84 represented a significant non-exertional impairment to be considered by the VE. (Doc. 12 at 12) (citing <u>Foreman v. Callahan</u>, 122 F.3d 24, 26 (8th Cir. 1997)). Yet, in <u>Foreman</u>, the claimant had an IQ below 75 and the ALJ did not call a vocational expert to testify. <u>Foreman</u>, 122 F.3d at 25-26. <u>Foreman</u> is therefore distinguishable on its facts.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

 /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 21, 2008.